## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 07 2017, 7:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Erin L. Berger
Evansville, Indiana

ATTORNEY FOR APPELLEE

Craig Goedde
Johnson, Carroll, Norton, Kent &
Goedde, P.C.
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Adoption of L.B.
(Minor Child)

M.B.,
*Appellant,*

v.

N.W.,
*Appellee.*

November 7, 2017

Court of Appeals Case No.
82A01-1706-AD-1274

Appeal from the Vanderburgh
Superior Court

The Honorable Renee Ferguson,
Magistrate Judge

Trial Court Cause No.
82D04-1610-AD-125

**Bailey, Judge.**

# Case Summary

[1] M.B. ("Father") and D.W. ("Mother") had a son, L.B. ("Child"), who was born on March 11, 2013. Mother subsequently married N.W. ("Stepfather"), who petitioned to adopt Child. Father objected. Following a hearing, the trial court determined that Father's consent to the adoption was unnecessary, and it granted the petition for adoption. Father now appeals, raising the sole issue of whether the trial court erred in determining that his consent was unnecessary.

[2] We affirm.

# Facts and Procedural History

[3] Father and Mother became romantically involved in 2011, and moved in together. Child was born in 2013. Around the time of Child's birth, Father executed a paternity affidavit confirming that he was Child's biological parent.

[4] One day in January 2014, Father and Mother began arguing, and Father choked Mother until she lost consciousness. Father was arrested, and was prohibited from contacting Mother for one year. Around the time of Father's arrest, Mother filed a petition seeking a court order requiring Father to pay child support. Father was ordered to make weekly payments, which he intermittently paid. At the time Mother petitioned for child support, neither parent asked the court to enter an order concerning parenting time.

[5] Mother and Stepfather began dating in 2014, and eventually got married in early 2015. Meanwhile, Mother permitted Father to spend time with Child

from March 2014 to July 2014. When Father lost his job in July 2014 and was forced to leave his residence, Mother no longer allowed Father to spend time with Child. At some point later that year, Father was incarcerated. While he was incarcerated, Father wrote a letter to Mother that was directed to Child.

[6] After the no-contact order expired in early 2015, at a time when Father was no longer incarcerated, Father sent Mother several text messages inquiring about parenting time. Father sent these messages from January 2015 to June 2015. Father also called Mother several times. Mother would usually not respond to Father's messages, but when she did, Mother indicated that Father should seek court-ordered parenting time. Father indicated that he would do so, but that he needed Mother's address. At one point in February 2015, Father contacted the Parenting Time Center in Evansville to orchestrate supervised visitation, but when the Parenting Time Center contacted Mother, she declined the services.

[7] Father last sent a text message to Mother on June 10, 2015. He last called Mother on July 30, 2015. On November 4, 2015, Father sent Mother two Facebook messages asking about Child. Then, on January 8, 2016, Father sent two Facebook messages to Mother expressing concern about her mother's health. Thereafter, Father had no contact with Mother until he filed, on September 15, 2016, a pro se motion alleging that Mother had contemptuously prevented him from spending time with Child. Shortly thereafter, Stepfather filed, in a separate action, the instant petition to adopt Child. Father filed an objection to Stepfather's petition, and Father was later appointed counsel. As to Father's contempt allegations in the other cause, the trial court treated the

motion as a petition to establish parenting time, and scheduled a hearing. When Father failed to attend the hearing, the petition was dismissed.

[8] On May 31, 2017, a hearing was held concerning Father's objection to Stepfather's petition for adoption. The trial court determined that it could grant Stepfather's petition without Father's consent, and granted the petition.

[9] Father now appeals.

# Discussion and Decision

[10] When reviewing a trial court's decision in an adoption proceeding, we presume that the decision is correct, and the appellant bears the burden of rebutting this presumption. *In re Adoption of O.R.*, 16 N.E.3d 965, 972 (Ind. 2014). "We will not disturb the trial court's ruling 'unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion.'" *Id.* at 973 (quoting *Rust v. Lawson*, 714 N.E.2d 769, 771 (Ind. Ct. App. 1999), *trans. denied*). Here, in granting Stepfather's petition, the trial court entered findings and conclusions. When the trial court has entered findings and conclusions, "we apply a two-tiered standard of review: 'we must first determine whether the evidence supports the findings and second, whether the findings support the judgment.'" *In re Adoption of T.L.*, 4 N.E.3d 658, 662 (Ind. 2014) (quoting *In re Adoption of T.W.*, 859 N.E.2d 1215, 1217 (Ind. Ct. App. 2006)). We "shall not set aside the findings or judgment unless clearly erroneous." Ind. Trial Rule 52(A). Findings are clearly erroneous if they are unsupported by any evidence

or the reasonable inferences to be drawn therefrom. *T.L.*, 4 N.E.3d at 662. A judgment is clearly erroneous when it is unsupported by the findings and the conclusions relying on those findings. *Id.* Moreover, in conducting our review, we must give "due regard . . . to the opportunity of the trial court to judge the credibility of the witnesses," T.R. 52(A), and we are to consider the evidence in the light most favorable to the trial court's decision. *T.L.*, 4 N.E.3d at 662.

[11]   Ordinarily, a petition to adopt a child "may be granted only if written consent to adoption has been executed" by the child's parents. Ind. Code § 31-19-9-1. However, "[c]onsent to adoption . . . is not required from . . . [a] parent of a child in the custody of another person if for a period of at least one (1) year the parent . . . fails without justifiable cause to communicate significantly with the child when able to do so." I.C. § 31-19-9-8(a). This exception does not apply if a parent has engaged in even a single significant communication with the child during the pertinent timeframe. *See Rust*, 714 N.E.2d at 773.

[12]   When a natural parent has contested an adoption, the person seeking to adopt the child "has the burden of proving that the parent's consent to the adoption is unnecessary." I.C. § 31-19-10-1.2(a). "Whether this burden has been met is necessarily dependent upon the facts and circumstances of each particular case, including, for example, the custodial parent's willingness to permit visitation as well as the natural parent's financial and physical means to accomplish his obligations." *Rust*, 714 N.E.2d at 772. Moreover, "[e]fforts of a custodial parent to hamper or thwart communication between parent and child are relevant in determining the ability to communicate." *Id.*

[13] The evidence favorable to the trial court's decision indicates that from August 2015 through August 2016—a period of at least one year—Father twice contacted Mother, and Father did not directly communicate with Child. On November 4, 2015, Father sent Mother two Facebook messages asking questions about Child, stating that he "hat[ed] life without him" and "want[ed] him." Pet'r's Exhibit E. Then, in early 2016, Father sent a series of Facebook messages to Mother expressing concern about her mother's health; Father noted that he did not want her to lose her mother or for Child "to lose his grandmother." Pet'r's Exhibit H. During this timeframe, it appears that Father sought no other way to communicate with Child, such as by directing messages to Child or by writing a letter, which he had sent in the past while incarcerated.

[14] Father does not argue that he engaged in any significant communication with Child after he last saw Child in July 2014. Rather, Father argues that there was justifiable cause for his failure to communicate. Father contends that Mother thwarted his ability to communicate with Child by responding to him on only three occasions and by "refus[ing] to allow [Father] to see or communicate with [Child]." Appellant's Br. at 13. According to Father, by granting Stepfather's petition, the trial court essentially "rewarded Mother's refusal to work with [Father] concerning his contact with [Child]." *Id.* at 13-14.

[15] In arguing that Mother thwarted his attempts to communicate with Child, Father likens this case to *D.D. v. D.P.*, 8 N.E.3d 217 (Ind. Ct. App. 2014). There, a father had moved to Washington D.C. for work after his marriage was dissolved in Indiana. *D.D.*, 8 N.E.3d at 218. Rather than pursue litigation, the

father repeatedly called and emailed the mother of his young children, sending over sixty emails requesting parenting time. *Id.* at 218. The mother responded to just five emails, and when she did, "she seemed interested only in terminating his parental rights" or in convincing the father that adoption was in the children's best interests. *Id.* at 221. When the children's stepfather later petitioned to adopt the children, the trial court determined there was justifiable cause for father's lack of direct communication with the children. *Id.* at 220. This Court upheld that determination on appeal. *Id.* at 222.

[16] Here, Father resided in the general area of Southwestern Indiana, and Father did not sustain his efforts to connect with Child. Moreover, unlike the mother in *D.D.*, Mother did not seek to persuade Father to give up his parental rights. Rather, in each of her three responses, Mother directed Father to obtain a court order to establish parenting time—an indication that parenting time was possible if Father took certain steps. And although Father testified that on many occasions he had "jump[ed] through flaming hoops trying to get the ball rolling" on court-ordered parenting time, Tr. Vol. II at 132, the trial court did not find Father credible. Indeed, the trial court observed that although Father claimed that he needed Mother's address to initiate an action regarding parenting time, Father obtained Mother's address in the spring of 2016 but waited until September to take any formal action. Father blamed his failure to take action on being in a halfway house, but the trial court observed that being in a halfway house would not have kept Father from being able to exercise his

"legal right to come down to the courthouse and file an action" with respect to his parenting time. *Id.* at 144.

[17] Viewing the evidence in the light most favorable to the decision, we cannot say that the trial court clearly erred in determining that Father lacked justification for his failure to significantly communicate with Child for more than a year. Thus, there is sufficient evidence supporting the trial court's determination that Father's consent was unnecessary to grant Stepfather's petition to adopt Child.[1]

## Conclusion

[18] The trial court did not clearly err in determining that Father's consent to the adoption was unnecessary.

[19] Affirmed.

Baker, J., and Altice, J., concur.

---

[1] The trial court also identified an alternative statutory basis for its determination that Father's consent was unnecessary, to which the parties direct argument on appeal. Having concluded that the trial court's determination was supported by at least one statutory basis, we need not address this additional basis.